UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

**MARGARITA MERCADO**,            Case Number 1:12 CV 2220

    Plaintiff,                                  Magistrate Judge James R. Knepp II

    v.                                           MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

## INTRODUCTION

Plaintiff Margarita Mercado filed a complaint against the Commissioner of Social Security seeking judicial review of the decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405 (g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On April 3, 2009, Plaintiff filed an application for DIB alleging a disability onset date of February 21, 2009. (Tr. 162-63). She claimed she was disabled due to deformities in her right leg and both hands. (*See* Tr. 83). Her claims were denied initially and on reconsideration. (Tr. 82-86, 92-93). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 93-95). Plaintiff (represented by counsel) testified at the hearing and a vocational expert (VE) testified at a supplemental hearing, after which the ALJ concluded Plaintiff could perform jobs existing in the national economy and was not disabled. (Tr. 29-30, 37-63). The Appeals Council denied Plaintiff's request for review (Tr. 1-4), making the hearing decision the final decision of the

Commissioner. 20 C.F.R. §§ 404.955, 404.981. On August 30, 2012, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKROUND

Personal and Vocational History

Plaintiff was 39 years old on her alleged onset date. (Tr. 29, 162). She lived with her daughter, son, daughter-in-law, and grandchild. (Tr. 208-09). She completed high school and had past relevant work experience as a factory assembler. (Tr. 40, 55). Before her employment ended on February 21, 2008, Plaintiff took a week off work because of her hand condition. (Tr. 194). When she returned to work, she was laid off due to the economy. (Tr. 194). Plaintiff stated she asked to be laid off because her doctor allegedly said she was doing too much work and suffered from pain in her hands. (Tr. 56). After being laid off, Plaintiff occasionally made and sold chocolate-covered strawberries and vitamin products for extra income. (Tr. 61, 307). Plaintiff was charged with felony food stamp fraud because she received benefits while also receiving vacation pay from her job while on medical leave. (Tr. 306). She had to pay back the benefits she received. (Tr. 306).

With the respect to Plaintiff's daily activity, she could feed herself, bathe, and use the bathroom without reminders. (Tr. 210). However, she had difficulty buttoning and pulling zippers, and also experienced cramping in her hands when she washed or combed her hair. (Tr. 209-10). She prepared her own meals when not in pain and typically cooked for the whole week at one time so she could heat meals in the microwave during the rest of the week. (Tr. 210). When she was in a lot of pain, she said her daughter or son cooked. (Tr. 210). Plaintiff could put laundry into the washing machine but claimed she could not remove wet clothing from the washer without help. (Tr. 211). She could drive a car and go out by herself, and she shopped for

2

food or clothing for an hour once a week. (Tr. 211). She could also pay bills, count money, and handle her checking and savings accounts. (Tr. 212). Her hobbies included reading and making jewelry. (Tr. 204, 212). She socialized by talking and eating dinner with others several times a week. (Tr. 212).

Plaintiff said her conditions affected walking, sitting, standing, lifting, kneeling, squatting, reaching, bending, stair climbing, completing tasks, and concentration. (Tr. 213). She claimed she had chronic pain in her hands, elbows, and shoulders. (Tr. 56). She also reported she had problems from a prior surgery, which caused her right foot to swell and prevented her from standing or sitting for longer than an hour. (Tr. 58-59). She said she had to lay down during the day due to her pain. (Tr. 60).

Plaintiff felt she needed to be treated for depression, but did not receive treatment because she lacked medical insurance. (Tr. 62). She said there were days when she had difficulty doing housework and other activities due to depression. (Tr. 62).

Physical Health Evidence

Plaintiff received medical treatment for her physical impairments at MetroHealth Hospital from February 17, 2009 through September 30, 2010. (Tr. 265-73). On February 17, 2009, she saw Dr. Salman and complained of malaise, knee and hand pain, and headaches. (Tr. 268). On examination, Plaintiff had multiple finger and right foot deformities with surgical scars. (Tr. 269). Notes also indicated Plaintiff had a normal range of motion in her back, normal knee functioning, and she appeared healthy, alert, pleasant, and in no distress. (Tr. 269-70). On February 25, 2009, Plaintiff returned complaining of a sore throat and burning pain in her arms and hands. (Tr. 266). Dr. Salman diagnosed Plaintiff with osteoarthritis due to deformities and carpal tunnel syndrome, and he prescribed Gabapentin. (Tr. 267).

On May 12, 2010, Plaintiff saw Dr. Leu for red eyes and pain in her hands and right leg. (Tr. 343). Dr. Leu diagnosed congenital hand deformity, hand pain, and congenital foot deformity. (Tr. 344). He prescribed Naproxen tablets for pain and referred Plaintiff to the orthopedic department. (Tr. 344). That same month, she treated with Dr. Peterre of the orthopedic department for hand numbness and pain. (Tr. 347). A physical exam revealed decreased pinch and grip strength in both hands. (Tr. 348). Dr. Peterre opined Plaintiff's complaints were caused by carpal tunnel syndrome (Tr. 348), but nerve conduction studies the following month showed normal results, with no evidence of abnormality to suggest a clinical diagnosis of carpal tunnel syndrome. (Tr. 341-42).

On July 27, 2010, Plaintiff saw Dr. Bodman for pain in her toenails. (Tr. 362-64). Plaintiff denied claudication and numbness or tingling in her feet and hands, but experienced pain in her joints. (Tr. 363). Dr. Bodman diagnosed osteoarthritis in Plaintiff's foot joints and instructed her to apply cream on her ankles and toes daily. (Tr. 363).

On August 29, 2010, Plaintiff saw rheumatologist Dr. Khan complaining of "[a]ches and pains". (Tr. 357-62). Dr. Khan reported Plaintiff had full range of motion without pain, swelling, warmth, or tenderness in her upper and lower extremities, and examination revealed no neurological deficit or muscle weakness. (Tr. 359). However, Dr. Khan noted point tenderness in several locations on Plaintiff's body and congenital deformities in her hands involving foreshortening of several fingers. (Tr. 359). Plaintiff was diagnosed with fibromyalgia and Dr. Khan told her it was "benign [and] non-progressive [in] nature, and [wa]s not a serious condition". (Tr. 359-60). In September 2010, Dr. Khan again noted Plaintiff had full range of motion without pain, swelling, warmth, or point tenderness in her extremities, and he assessed Plaintiff's fibromyalgia as stable. (Tr. 351).

4

Dr. Saghafi performed a physical consultative examination on June 9, 2009. (Tr. 276). The examination showed Plaintiff was in no acute distress but had osseous deformities in the fourth and fifth fingers on both hands, with evidence of earlier surgical separation of the third and fourth digits due to webbing. (Tr. 276). Her motor examination revealed normal tone and bulk, and she had normal strength in all extremities. (Tr. 277). Dr. Saghafi diagnosed moderately severe congenital osseous deformations in the fingers of both hands, which compromised her grip strength and ability to manipulate fine objects. (Tr. 278). He also believed Plaintiff had some form of osteoarthritis of the hands causing moderately severe pain when performing heavy physical labor. (Tr. 278). However, Dr. Saghafi concluded Plaintiff could lift, push, and pull normally to perform activities of daily living. (Tr. 278). He also concluded Plaintiff could bend, walk, stand, travel independently, and understand and communicate satisfactorily with her peers. (Tr. 278).

On August 18, 2009, state agency physician Dr. McCloud assessed Plaintiff's physical capacity. (Tr. 328). He found Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, and could sit, stand, or walk for about six hours out of an eight-hour workday. (Tr. 328). Plaintiff had no restrictions in pushing and pulling, but Dr. McCloud noted Plaintiff should not operate hand controls. (Tr. 328). Dr. McCloud noted medical evidence showed decreased grip strength in Plaintiff's hands along with compromised grasp, manipulation, and fine coordination. (Tr. 328). However, Plaintiff had full strength and normal range of motion in her extremities. (Tr. 328). Dr. McCloud also found she was unlimited in reaching, and handling (gross manipulation), but could only perform fine manipulation occasionally. (Tr. 330). A second state agency physician, Dr. Figueroa, concurred with Dr. McCloud's opinion. (Tr. 339).

5

Mental Health Evidence

On August 15, 2007, a year and a half before her alleged onset date, Plaintiff went to the Center for Families and Children (CFC) seeking treatment for difficulties with irritability, depression, and problems sleeping. (Tr. 263). Dr. Vazquez assessed Plaintiff's affect as flexible, with sad mood and normal memory. (Tr. 264). He diagnosed Plaintiff with dysthymic disorder and assessed a Global Assessment of Functioning (GAF) score of 85.[1] (Tr. 264). Dr. Vazquez recommended counseling and prescribed Lorazepam as needed to improve Plaintiff's sleep. (Tr. 264).

Plaintiff met with social worker Nidia Perez at CFC in April 2009. (Tr. 307). Plaintiff explained she had kept busy selling vitamins and home-made chocolate-covered strawberries. (Tr. 307). Plaintiff also told Ms. Perez she had been charged with a felony for food stamp fraud. (Tr. 306).

On June 25, 2009, Plaintiff underwent a mental consultative examination with psychologist Dr. House. (Tr. 284). Dr. House reported Plaintiff was well groomed, ambulated without difficulty, and presented herself in a clear and coherent manner. (Tr. 286). She complained of carpal tunnel syndrome problems and pain in her right leg. (Tr. 285). She also stated she felt depressed all the time and had anxiety, which caused her to fight with her children. (Tr. 286). Her eye contact was adequate and she denied suicidal ideation. (Tr. 286). Though she complained of anxiety, it was not clear whether she was experiencing panic attacks. (Tr. 287).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 81-90 reflects absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range or activities, socially effective, generally satisfied with life, no more than everyday problems or concerns. *Id.*

6

Plaintiff was oriented, but her concentration and attention were mildly limited and she also showed some memory difficulties. (Tr. 287). Plaintiff told Dr. House she spent her time reading, watching her grandson, and listening to music. (Tr. 288). She also stated she liked to clean and do laundry, and cooked when she felt okay. (Tr. 288).

Dr. House opined Plaintiff was not limited in her ability to understand, remember, and follow instructions. (Tr. 289). Plaintiff was mildly limited in her ability to maintain concentration, persistence, or pace and perform simple repetitive tasks but was not limited in her level of adaptability, ability to relate to others, and judgment. (Tr. 288-89). She was moderately limited in her ability to withstand the stress of daily work activities. (Tr. 289). Dr. House diagnosed Plaintiff with depressive disorder and, based on her episodic levels of depression, assigned a GAF score of 55.[2] (Tr. 290).

On July 28, 2009, state agency psychologist Dr. Meyer found Plaintiff was mildly limited in her activities of daily living and social functioning and moderately limited in her ability to maintain concentration, persistence, or pace. (Tr. 302). He found she had no episodes of decomposition of extended duration. (Tr. 302). Dr. Meyer concluded Plaintiff was not significantly limited in her abilities to remember locations and work-like procedures, understand and remember simple and detailed instructions, perform within a schedule, maintain regular attendance and punctuality, sustain an ordinary routine, work in coordination with others without distraction, make simple work-related decisions, or interact socially. (Tr. 323). Plaintiff was moderately limited in her abilities to carry out detailed instructions and maintain attention and concentration for extended periods, complete a normal workday without interruptions from

---

2. A GAF score of 51–60 reflects moderate symptoms (e.g., flat affect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR*.

7

psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 323-24).

On February 2, 2010, Dr. Pineiro completed a case analysis on behalf of the state agency and concurred with Dr. Meyer's opinion. (Tr. 340).

ALJ Hearing

Plaintiff, represented by counsel, testified at an ALJ hearing on January 12, 2011, and the VE testified at a supplemental ALJ hearing on February 11, 2011. (Tr. 36, 47). The ALJ asked the VE to assume a hypothetical worker of Plaintiff's age, education, and work experience who could lift ten pounds frequently and 20 pounds occasionally; sit, stand, or walk up to six hours in an eight-hour workday with normal breaks; perform occasional fine fingering manipulation but frequent handling and feeling; and remember, understand, and carry out simple and detailed, but not complex instructions. (Tr. 40-41). The VE opined Plaintiff could not perform past relevant work but could perform other jobs existing in significant numbers in the national economy, including laundry worker, sales attendant, and food service worker. (Tr. 41-42).

ALJ Decision

On February 25, 2011, the ALJ found Plaintiff suffered from the severe impairments of congenital osseous deformations in the fingers of both hands, osteoarthritis, and depressive disorder. (Tr. 23). The ALJ noted Plaintiff's severe impairments were diagnosed using acceptable medical sources based on signs, symptoms and laboratory findings. (Tr. 23). Plaintiff's other impairments, including carpal tunnel syndrome, foot deformity, and fibromyalgia, were minimally limiting. (Tr. 24). The ALJ noted Dr. Khan emphasized Plaintiff's fibromyalgia was benign and non-progressive nature and said it was not a serious condition. (Tr. 24, 360). The ALJ also noted Dr. Saghafi's report indicating Plaintiff had normal strength and

8

range of motion in her upper and lower extremities, and Dr. House's report indicating Plaintiff could ambulate without difficulty, which provided evidence her leg and foot pain was not as serious as Plaintiff claimed. (Tr. 24, 280-82, 286). Also, although Plaintiff had a hand condition limiting her ability to perform fine fingering, she could perform basic activities of daily living. (Tr. 24, 210-13). Furthermore, even though Plaintiff's grip strength was compromised, the ALJ found it was not absent, and he noted Plaintiff could do arithmetic using paper and pencil. (Tr. 25, 288).

The ALJ determined Plaintiff had the residual functional capacity (RFC) to lift ten pounds frequently and 20 pounds occasionally; sit, stand, or walk up to six hours of an eight-hour workday with normal breaks; frequently perform handling and fingering but occasionally perform fine fingering manipulation; remember, understand, and carry out simple and detailed, but not complex instructions; and should not work in a fast-paced environment or work with strict production quotas. (Tr. 26, 40-41).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial

evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); see also 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

2. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); see also *Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in two ways. First, she claims the ALJ failed to recognize her fibromyalgia and right foot congenital deformity as severe impairments. (Doc. 16, at 10). Second, she contends substantial evidence did not support the ALJ's determination that she could perform frequent handling and fingering. (Doc. 16, at 14).

<u>Severe Impairments</u>

Plaintiff's argument regarding her fibromyalgia and right foot congenital deformity stems from the ALJ's obligation at step two of the disability analysis to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184, at *5) (emphasis in original). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find

additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ found Plaintiff's osteoarthritis, congenital osseous deformations in her hands, and depressive disorder to be severe impairments. (Tr. 23). Whether or not Plaintiff's fibromyalgia and right foot deformity were also severe is legally irrelevant and does not constitute reversible error. Once the ALJ found Plaintiff had severe impairments, he continued to evaluate all Plaintiff's impairments – including her fibromyalgia and right foot deformity – in determining her RFC.

An impairment is severe only if it significantly limits the claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1505, 404.1520, 404.1521. There is no objective medical evidence indicating Plaintiff's fibromyalgia or foot impairment significantly limited her ability to work. Rheumatologist Dr. Khan characterized her fibromyalgia as having a "benign non-progressive nature" and said it was not a serious condition. (Tr. 360). Dr. Khan later noted Plaintiff had full range of motion without pain, swelling, warmth, or point tenderness in her extremities, and assessed Plaintiff's fibromyalgia as stable. (Tr. 351). Dr. Khan also recommended Plaintiff participate in aerobic exercises for at least 20 minutes daily, which indicated she was not as significantly limited as she claimed to be. (Tr. 361). Plaintiff did complain of pain in her right foot and Dr. Leu reported her foot had surgical scars and was deformed. (Tr. 344). However, Dr. Khan, Dr. Saghafi, and Dr. McCloud noted Plaintiff had full strength and normal range of motion in her extremities. (Tr. 277, 328, 359). Dr. House also noted Plaintiff ambulated without difficulty. (Tr. 286). Plaintiff could also perform daily activities like cooking, shopping for food and clothes, and doing laundry. (Tr. 210-11). There were no other notes in the record indicating her right foot deformity caused significant limitation.

12

Nevertheless, the ALJ considered both severe and non-severe impairments in determining Plaintiff's RFC. Specifically, the ALJ limited sitting, standing, or walking to six hours out of an eight-hour workday, and assessed other limitations consistent with difficulty walking or restrictions resulting from pain, taking into account her fibromyalgia and right foot deformity along with her other limitations. (Tr. 26).

Gross and Fine Manipulation

The ALJ found Plaintiff could engage in frequent handling and fingering but was limited to occasional fine fingering manipulation due to her hand impairments. (Tr. 26). Plaintiff testified she had chronic pain in her hands and lifting and changing hands increased the pain (Tr. 57), and her physical examination revealed decreased pinch and grip strength in both her hands (Tr. 278, 347). However, substantial evidence in the record showed she could perform frequent handling and fingering.

Dr. Saghafi examined Plaintiff and diagnosed moderately severe congenital osseous deformations in the fingers of both hands. (Tr. 278). He found this compromised her grip strength and ability to manipulate fine objects, but concluded Plaintiff could lift, push, and pull normally to perform activities of daily living. (Tr. 278). State agency reviewing physician Dr. McCloud opined Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, and had full strength and normal range of motion in her extremities. (Tr. 328). Dr. McCloud also found she was unlimited in reaching and handling (gross manipulation), but could only occasionally perform fine manipulation. (Tr. 330).

Plaintiff's daily living activities also supported the ALJ's RFC determination. She could feed herself, bathe, and use the bathroom despite difficulty pulling zippers and combing her hair. (Tr. 210). She also cooked, cleaned, and went shopping. (Tr. 210-11). Furthermore, Plaintiff

13

made and sold chocolate-covered strawberries, and also made jewelry as a hobby. (Tr. 204, 307). All these activities require handling and fingering and showed Plaintiff remained capable of using her hands.

The ALJ's RFC determination considered appropriate limitations. For instance, he limited the amount Plaintiff could lift to ten pounds frequently and 20 pounds occasionally. (Tr. 26). He also precluded her from working in a fast-paced work environment, restricted her from workplaces with strict production quotas, and limited her to only occasional fine fingering manipulation. (Tr. 26). These limitations sufficiently took into account Plaintiff's hand impairments, and substantial evidence supported the conclusion that Plaintiff could perform frequent handling and fingering.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, this Court finds the Commissioner's decision denying DIB benefits supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED

                                                s/James R. Knepp, II
                                                United States Magistrate Judge